UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 13-cv-11078-RGS

UNITED STATES OF AMERICA

v.

SCOTT G. BAKER AND ROBYN BAKER

MEMORANDUM AND ORDER ON PLAINTIFF UNITED STATES OF
AMERICA'S MOTION FOR SUMMARY JUDGMENT

September 30, 2014

STEARNS, J.

The United States filed this Complaint on May 1, 2013, seeking a
monetary judgment against defendant Scott Baker for $4.4 million in
unpaid federal income taxes assessed by the Internal Revenue Service (IRS)
in 2009 and 2010. The United States also sought to enforce related tax
liens against real property located at 667 Main Street, Hingham,
Massachusetts (the Hingham Property), and sought a judgment against
defendant Robyn Baker, individually and as trustee of the C&S Realty Trust
and the S&R Realty Trust, for tortious conversion of encumbered assets.

The individual claim against Scott Baker is stayed, pending resolution
of his bankruptcy petition (Case No. 13-13618 (Bankr. D. Mass), filed in
June of 2013), but the claims against the real property (and against Robyn

Baker) are not subject to the bankruptcy stay as the affected assets are not part of Scott Baker's bankruptcy estate.[1] The United States now moves for summary judgment on the non-stayed claims.

## BACKGROUND

The IRS has assessed Scott Baker more than $4 million in unpaid income tax liabilities (consisting of $2,476,526 in tax assessments for income tax years 1997-2002, and $1,960,924 in accrued penalties and interest as of May 1, 2013).[2] Baker is a self-employed construction manager who currently earns over $80,000 per year. He was previously involved (beginning in 1997) in the construction of various Planet Fitness gyms as

---

[1] On September 12, 2013, Scott Baker filed an adversary complaint against the United States seeking a declaration from the Bankruptcy Court that the tax liens filed by the United States do not attach to the Hingham Property (or to certain real estate parcels in New Hampshire, or to the Scott Baker Family Trust). *See* Adv. Proc. No. 13-01358 (Bankr. D. Mass.) (hereinafter "Adv. Proc."). The Bankruptcy Court, noting that it likely lacked jurisdiction because Scott Baker had disclaimed any interest in these assets, entered an order of abstention and dismissal with regard to the affected counts. Adv. Proc., Dkt. #12. Count I of Scott Baker's adversary complaint, which involves the dischargeability of his tax debts in bankruptcy, is still pending before the Bankruptcy Court.

[2] In September of 2003, Scott Baker amended his 1997-2002 income tax returns to carryback the remainder of a $2.9 million loss that he generated from participating in a subsequently disallowed tax shelter. Baker's unpaid taxes for those years were not assessed by the IRS until 2009 and 2010; thus, the 10-year statute of limitations on collection of these tax liabilities has yet to run.

part of his business.  Robyn Baker (née Robyn Gauthier) is Scott Baker's ex-wife.  (The couple married on December 12, 1998, and they have two teenage children.  They divorced in 2008).  They filed joint income tax returns for tax years 1999, 2000, and 2001.[3]  They filed separate income tax returns for tax year 2002.

### 2001 Tax Return

In October of 2002, the Bakers jointly filed their 2001 federal income tax return, reporting an Adjusted Gross Income (AGI) of over $1 million.  The Bakers were taxed on roughly a quarter of that income, significantly less than what would have been due, because of reported "paper" losses that reduced their taxable income from $1,114,449 to $289,688.  The losses were generated by a "Son-of-Boss"[4] tax shelter scheme.[5]

---

[3] In February of 2000, the Bakers purchased two parcels of land in West Campton, New Hampshire.  These parcels are the subject of a separate case brought by the United States against the Bakers in the district of New Hampshire.  *See* Case No. 13-cv-213-PB (D. N.H.).

[4] For an explanation of the Son-of-Boss (Bond Options Sales Strategy) tax shelters, see *Fid. Int'l Currency Advisor A Fund, LLC ex rel. Tax Matters Partner v. United States,* 661 F.3d 667 (1st Cir. 2011) (Boudin, J.).

[5] This fact is not disputed, and both Bakers signed the couple's 2001 tax return.  However, Robyn Baker disputes that *she* participated in the Son-of-Boss scheme, claiming that "[Scott] Baker made the 'Son of Boss' on his own."  Dkt. #30-7 ¶ 4.  This is not a material dispute, because the artificial losses listed on the original jointly-filed 2001 return are no longer

### *2002 Tax Return*

In December of 2002, Scott Baker, together with a college friend, sold eight Planet Fitness gyms to Bally Fitness for approximately $15 million. Scott Baker received roughly $4,600,000 in Bally Fitness stock, which he eventually sold for $3.4 million. *See* Adv. Proc., Compl. ¶ 5. As noted, Scott and Robyn Baker filed separate tax returns for tax year 2002. Scott Baker, resorting to a second abusive tax shelter to avoid income tax on the gains from the Planet Fitness sale, reported a negative $2.5 million in income on his 2002 return, which he filed on September 23, 2003. He thus claimed a tax refund of $42,655 for income taxes he had already paid that year, and then amended the couple's joint 1997-2001 tax returns to claim (and receive) additional refunds by carrying-back the uncredited portion of the 2002 losses. As a result, the IRS refunded the Bakers roughly all of the tax amounts they had paid for these earlier years. Scott Baker deposited the

---

at issue. The Bakers resolved the IRS claims related to the 2001 Son-of-Boss tax shelter in December of 2004, pursuant to a Global Settlement Initiative. *See* Adv. Proc., Dkt. #41-4 (Closing Agreement between IRS and Bakers signed December 6, 2004). The 2001 tax liabilities at issue in this case are related to the disallowance of the tax shelter losses that Scott Baker reported on his 2002 return, which he carried back to tax years 1997-2001. These taxes were assessed only against Scott Baker. *See* Dkt. #22-7 (IRS Transcripts, noting on the 1997, 1998, 1999, 2000, and 2001 transcripts "separate assessments" independent of the original jointly-filed returns).

Planet Fitness sale proceeds and the tax refunds into an account in the name of the "Scott Baker Family Trust."

### The Scott Baker Family Trust

On June 30, 2003, Scott Baker established and became the settlor of the "Scott Baker Family Trust," a Cayman Island Trust, with a Royal Bank of Canada account in the Cayman Islands. Baker granted himself a one-third beneficial interest in the Trust. The remaining beneficial interests were divided among Robyn Baker and the Bakers' minor children. Scott Baker created the Trust for the purpose of engaging in the tax sheltering transaction used in his 2002 return to offset the $3.4 million gain. *See* Adv. Proc., Compl. ¶ 7. The entire corpus of the Trust was invested in a fund called "IMA." According to Robyn Baker, at some point in late 2005, the Bakers learned that the investment in IMA was essentially worthless, as it proved to be a Ponzi scheme. *See* C&S Trustee Dep., 40:1-10.

### IRS Examines Scott Baker's 2002 Return and Related Carrybacks

On December 6, 2004, the Bakers signed an agreement with the IRS, pursuant to a Global Settlement Initiative, resolving the claims arising from the use of the 2001 Son-of-Boss tax shelter. *See* Adv. Proc., Dkt. #41-4. On August 22, 2005, the Bakers purchased the Hingham Property as tenants by the entirety for $1,622,500. Also in August of 2005, the IRS opened an

5

examination of Scott Baker's (individually filed) 2002 tax return.[6]  While Scott Baker initially elected to participate in a second IRS Global Settlement Initiative, agreeing to pay $1.2 million, he was ultimately removed from the program at some point after the IRS requested disclosure of his assets in 2007, because of a professed inability to pay the promised amount.[7]

---

[6] The IRS did not record an assessment against Scott Baker for the disallowed 2002 tax-shelter losses (and the accompanying carrybacks) until May 14, 2009.  An additional assessment was made on May 20, 2010.  By the time the IRS recorded the assessment, the Bakers had transferred the Hingham Property to a realty trust and subsequently agreed to a division of property as part of a Separation Agreement (that the United States contends was a sham).  The Separation Agreement purported to transfer Scott Baker's half-interest in the Hingham Property to Robyn Baker.

[7] Scott Baker insists that he intended to repatriate the $3.4 million invested with IMA to satisfy his debt to the IRS, but afterwards learned that the IMA money had vanished.  The timeframe in which the Bakers learned of the Ponzi scheme and Scott Baker undertook the Global Settlement Initiative is unclear.  The Scott Baker Family Trust eventually received a $202,000 creditor's distribution from IMA's bankruptcy estate, but the entire sum went to Robyn Baker, who had been named as the new Trustee in the interim.  She testified that she invested the entire $202,000 into a company named Design Decisions owned by her friend Leslie Smith.  Smith hired Scott Baker to do construction on a home being built by Design Decisions, and when the home was sold, Robyn Baker received a return on the "portion that I invested."  Robyn Baker Dep. (hereinafter "RB Dep."), 47:19.  Robyn Baker further stated that she reinvested the money with Design Decisions "[s]o that Scott could remain employed, have a job, be able to work, and hopefully earn more money on the money I gave her."  *Id.* at 48:5-9.  She also testified that she used $84,000 of the money to pay the attorneys who have done work for her and Scott.  *Id.* at 42:2-43:6 and 48:22-49:2.

### The IRS Requests Disclosure of Assets, and the Bakers Transfer the Hingham Property to a Realty Trust

In early February of 2007, the IRS requested that Scott Baker complete a Form 433-A, by March 1, 2007, listing all of his assets. It is undisputed that the Bakers were then aware of the probability of a looming multi-million dollar tax assessment. On February 22, 2007, the Bakers established the S&R Realty Trust, with Robyn Baker as Trustee. They then transferred the title to the Hingham Property, by way of a quitclaim deed, to the new Trust. That same day, before the transfer was recorded, the Bakers remortgaged the Hingham Property, naming Scott Baker as the sole mortgagor.

Also on February 22, 2007, the Bakers established a second realty trust, the C&S Realty Trust. (S&R stands for Scott and Robyn, and C&S stands for the first letters of the first names of the Bakers' minor children). Robyn Baker was also the sole trustee for C&S Trust. The beneficiaries of the C&S Realty Trust were at least the Baker's two minor children (neither party attached the schedule of beneficiaries, while Robyn Baker, the Trustee of the S&R and C&S Realty Trusts was unclear in her deposition as to whether she was also a beneficiary of the S&R or C&S Realty Trusts). The Bakers then transferred a property located at 253 Humarock Beach Road in Scituate, Massachusetts (Humarock Property) into the C&S Trust.

Robyn Baker (who was deposed at least three times in this case (once in her personal capacity, once in her capacity as the Trustee of the S&R trust, and once in her capacity as the Trustee of the C&S Trust), testified that the S&R Realty Trust had no other purpose than holding title to the Hingham Property, which was the Trust's only asset, S&R Trustee Dep., 14:4-15, and that the C&S Realty Trust was formed "to protect a beach house at 253 Humarock Beach Road from any potential construction people that may have had an issue with Scott." C&S Dep., 9:1-6. She also testified that Scott Baker did not receive any consideration for transferring his half interests in property into Trusts for which only Robyn was a Trustee, and for which he was not a beneficiary. *See* S&R Dep., 16:17-18:3.[8]

---

[8] Shortly after transferring the Humarock Property to the C&S Trust, it was sold, yielding proceeds of roughly $433,000. Robyn Baker testified that she initiated the sale of the Humarock beach house and deposited the proceeds ($433,000) into the South Shore Bank account of the C&S Realty Trust (for which she held sole signatory authority). She also testified that the C&S Trust had no other activity or purpose than to receive the proceeds from the sale of the beach house. A few months later, $300,000 was withdrawn from the account and used to pay down an equity line of credit extended by Rockland Trust. RB Dep., 21:16-22:2. Robyn Baker separately testified that she used the funds from the account for her personal expenses, such as living expenses, paying off credit cards, and for her children's activities. *See* C&S Dep., 17:15-22 (noting that she "used [these funds] to live off of"). According to Robyn Baker, the South Shore Bank account (and the C&S Realty Trust) no longer exist. C&S Dep., 18:9-17.

Robyn Baker was aware that Scott Baker had an outstanding federal tax liability,[9] and while she was concerned about the IRS tax debt at the time the S&R and C&S Trusts were created, she does not believe that the Trusts were established to avoid that debt. Robyn Baker also testified that another reason that she and Scott Baker placed these properties in trust was because they were "contemplating separating and dividing assets." C&S Dep., 9:6-7.

On March 5, 2007, the Bakers recorded the deeds transferring the Hingham Property to the S&R Realty Trust and transferring the Humarock Property to the C&S Realty Trust. On March 6, 2007, the Bakers completed and signed the IRS Form 433-A. The Bakers listed the Hingham Property and the Humarock Property under the "real estate" section of the Form. *See* Dkt. #22-34.

In January of 2008, shortly before the Bakers filed for divorce, a $258,801 payment was made from the C&S Realty Trust account to IndyMac Bank to pay down the mortgage on the Hingham Property.

---

[9] Robyn Baker has alleged that, at the time of the transfer of the properties to the Trusts, she was under the impression that she also had an outstanding tax liability.

### Divorce Decree/Settlement Agreement

On January 11, 2008, the Bakers filed for divorce. One day prior, on January 10, 2008, the Bakers signed a Separation Agreement that was later incorporated into the divorce judgment. *See* Dkt. #40-3 at 5-14. The Agreement stated that "irreconcilable differences [had] arisen and continue to exist between the parties with no chance of reconciliation since March 1, 2007," and that the Agreement was made "in order to settle all claims of the parties and all other matters which should be settled in view of the pending complaint for divorce." *Id.* at 5. The Agreement provided that the Bakers would retain joint physical and legal custody of their children. *See id.* at 5-6 ("The parties agree to consult with each other concerning the daily living needs and schedule of the children."). Article II of the Agreement, titled "Financial Arrangements," contained various provisions regarding health insurance and other expenses, while explicitly noting that the Agreement obligated neither party to pay child support or alimony *Id.* at 6.

Article III of the Agreement, titled "Real Estate," divided the Bakers' various property holdings. It gave Robyn Baker the sole ownership of the Hingham Property, while noting that the property "is presently held by S & R Realty Trust for the benefit of the minor children," as well as two parcels of land in New Hampshire. Article III further required that Scott Baker assume the Hingham Property mortgage and make all monthly payments

(while waiving "all rights in the Marital Home").  Notwithstanding, the Agreement gave Scott Baker permission to reside on the Hingham Property, while Robyn Baker was to be responsible for utility payments and routine repairs.[10]  Scott Baker also assumed the "marital credit card debt," all liabilities for his business, and received sole ownership of his business ventures,[11] while "[Robyn] agree[d] to help [Scott] be successful in any business ventures he may wish to pursue."  *Id.* at 11.  Lynn Erickson, the attorney who drafted the Separation Agreement, ostensibly acted as Robyn Baker's lawyer, but without her avowed knowledge.  RB Dep., 59:16.

On February 28, 2008, the Probate Court entered a judgment incorporating the Separation Agreement and giving it "the full force and effect of an order of this Court."  Dkt. #30-3 at 2.  The divorce became final

---

[10] The Bakers agreed to "share equally" the cost of any capital improvements to the home exceeding $500.  Other provisions of the divorce included the division of vehicles (a 2005 Chevy Tahoe, two motorcycles, and a boat to Robyn Baker, and a "Chevy pickup truck, Construction trailers, Kabota tractor and contents of shed" to Scott Baker), the division of a "Rockland Trust joint bank account" (to be split equally), and "any monies stolen from the parties" (to Robyn Baker).  *Id.* at 10.

[11] Scott Baker claims that at the time of the divorce, his business ventures were worth approximately $1 million.  Robyn Baker testified that on the eve of the divorce, "Scott was trying to sell [the Scarsdale Planet Fitness location] to the owner of Planet Fitness and it had a value of $250,000."  RB Dep., 33:15-18.  On November 4, 2009, Scott signed another IRS Form 433A, under penalties of perjury, reporting that his business interests had a monetary value of zero dollars.  *See* Dkt. #22-18.

on May 29, 2008.[12]  Since the entry of the divorce decree, Scott Baker has paid the monthly $6,200 mortgage on the Hingham Property.  Most of the household bills, including the gas and electrical utilities, are in his name.  The current equity in the Hingham Property is approximately $300,000.

## DISCUSSION

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Even in cases where elusive concepts such as motive or intent are at issue, summary

---

[12] According to the United States, the Bakers' divorce was a sham concocted to fraudulently transfer property under the guise of a marital division of assets.  In addition to the circumstances surrounding the Separation Agreement (and several of its out-of-the-ordinary provisions), the United States bases its contention that the divorce was a sham on statements made by the Bakers in deposition, in correspondence, and on social media.  For example, on June 3, 2008, Scott Baker submitted a request for a mortgage modification to IndyMac Bank describing himself as follows: "I was the owner of a business and sold the business to Bally Total Fitness and retired with my wife and two kids."  Dkt #22-3.  On May 11, 2009, a press release announcing Robyn Baker's new position as a "relationship consultant" at a company called "The Right One" identified her as "resid[ing] in Hingham with her husband and two children." Dkt. #22-12.  As of January 7, 2010, Robyn Baker on her business website, betterspaces.net, stated that she was the owner and operator of "Better Spaces" and described herself as follows:  "My name is Robyn Baker and I live with my husband and two children in Hingham, Massachusetts. . . . My husband is a builder . . . ."  Dkt. #22-4.  Finally, at a deposition, Scott testified that he never told his children that he and Robyn Baker are divorced and he does not know if they know.  *See* Scott Baker Dep., 57:12-22.

judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990). However, the non-moving party is given the benefit of all favorable inferences, *Oliver v. Digital Equip. Corp.*, 846 F.2d 103, 105 (1st Cir. 1988), and "when the facts support plausible but conflicting inferences on a pivotal issue in the case, the judge may not choose between those inferences at the summary judgment stage." *Coyne v. Taber Partners I*, 53 F.3d 454, 460 (1st Cir. 1995).

The United States alleges that the IRS tax liens relating to the 2009 and 2010 assessments attach to the Hingham Property. It seeks a forced sale to collect the proceeds, or any portion, that are subject to the tax lien. The Bakers allege (in separate oppositions) that Robyn Baker holds title to the Hingham Property free and clear of any tax liens because the property does not constitute "property or rights to property" attributable to Scott Baker (because the transfer of the property to Robyn Baker preceded the attachment of any tax liens on property of Scott Baker). Scott Baker's counsel also suggested at oral argument that this case might well be mooted by the Bankruptcy Court's determination on dischargeability, which is still pending.

### *Relevance of Dischargeability Adversary Proceeding*

Scott Baker alleges that the United States' motion "fails because Mr. Baker's tax debt to the United States is dischargeable and should be discharged," Dkt. #29 at 2. While this court takes no position on the dischargeability of Scott Baker's tax debt under 11 U.S.C. § 523(a)(1)(C), it is important to note that a bankruptcy discharge would have no legal effect on the United States' lien enforcement counts against the Hingham Property and/or Robyn Baker. *See* 11 U.S.C. § 524(e) ("[D]ischarge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt."); *see also In re Witkowski*, 176 B.R. 114 (Bankr. D. Mass. 1994) (same). This is not only because the Bankruptcy Court explicitly abstained from adjudicating these matters, noting that they were not "property of the estate," but also because "a discharge extinguishes *only* 'the personal liability of the debtor.'" *Johnson v. Home State Bank,* 501 U.S. 78, 83 (1991), quoting 11 U.S.C. § 524(a)(1) (emphasis in original); s*ee also id.* at 84 (noting that the Bankruptcy Code, at section 522(c)(2), codified the rule of *Long v. Bullard,* 117 U.S. 617 (1886), and thus "a bankruptcy discharge extinguishes only one mode of enforcing a claim-namely, an action against the debtor *in personam* – while leaving intact another – namely, an action against the debtor *in rem.*");

*Dewsnup v. Timm*, 502 U.S. 410 (1992) (noting that "a lien on real property pass[es] through bankruptcy unaffected"). While it remains to be determined whether and to what extent the United States' tax liens attached to the Hingham Property, that determination would neither be "moot" nor "void" as a result of a bankruptcy discharge.

### Fraudulent Conveyance

The United States seeks first to establish that the transfer of the Hingham Property to Robyn Baker was fraudulent and should be set aside. "State law creates legal interests and rights," even though federal law "must prevail no matter what name is given to [an] interest or right by state law." *Morgan v. Comm'r*, 309 U.S. 78, 80-81 (1940). Thus the inquiry begins with the Massachusetts Uniform Fraudulent Transfer Act (UFTA). The UFTA, Mass. Gen. Laws ch. 109A, § 5 (emphasis added), states:

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> (1) with actual intent to hinder, delay or defraud any creditor of the debtor; **or**
>
> (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, **and** the debtor . . . intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

The First Circuit has acknowledged "that 'it is often impracticable, on direct evidence, to demonstrate an actual intent to hinder, delay or defraud creditors.' Thus, courts frequently infer fraudulent intent from the circumstances surrounding a transfer, placing particular emphasis on certain indicia or badges of fraud." *F.D.I.C. v. Anchor Props.*, 13 F.3d 27, 32 (1st Cir. 1994) (internal citations omitted). Moreover, the phrase "to hinder, delay, or defraud" is to be read in its natural disjunctive sense. Thus, proof of an "intent to defraud is not [always] necessary, but rather an intent to hinder or delay is sufficient for a finding of liability." *Davis v. United States,* 869 F. Supp. 49, 52 (D. Mass. 1994), citing *Joseph P. Manning Co. v. Shinopoulous*, 317 Mass. 97, 99 (1944). In fashioning remedies under the UFTA, a court must also be sensitive to the strong Massachusetts public policy of protecting the interests of a nondebtor spouse. *Bakwin v. Mardirosian*, 467 Mass. 631, 638 (2014).

It is impossible to view the convoluted and tax-convenient shuffling of the Bakers' assets with anything but a healthy dose of skepticism. The United States has come forward with evidence from which a fact-finder could infer that the transfer of Scott Baker's half-interest in the Hingham Property was fraudulent or that Robyn Baker holds title to the property as a

nominee for Scott Baker.[13]  Aside from any inference of an intent to hinder

or delay creditors, it is undisputed that in 2007, when Scott Baker

transferred the Hingham Property to the S&R Trust and assumed the new

mortgage, both he and Robyn Baker knew that a ruinous tax assessment

was likely imminent.  It is also undisputed that Scott Baker transferred his

interest in the Hingham Property to the Trust for no tangible consideration.

If the United States was simply seeking to set aside this first transfer of the

Hingham Property in its entirety to the S&R Realty Trust as a fraudulent

conveyance, the issue might well be resolved on summary judgment.[14]  It is

beyond peradventure that "a settlor cannot place property in trust for his

---

[13] One need only compare the undisputed facts of this case to the so-called "badges of fraud" enumerated in Mass. Gen. Laws ch. 109A, § 5(b)(1)-(11), to appreciate how powerful is the inference of fraud that a jury might draw.

[14] *See, e.g., Anchor Props.*, 13 F.3d at 32 (noting that "[C]ourts frequently infer fraudulent intent, "placing particular emphasis on certain indicia or badges of fraud[,] . . . the more common [of which] are:  "(1) actual or threatened litigation against the debtor; (2) a purported transfer of all or substantially all of the debtor's property; (3) insolvency or other unmanageable indebtedness on the part of the debtor; (4) a special relationship between the debtor and the transferee; and (5) retention by the debtor of the property involved in the putative transfer.") (internal citations omitted). Both Bakers have admitted that the purpose of the first transfer was to protect the Hingham Property from Scott Baker's creditors and that Scott Baker retained control of the property as if no such transfer had occurred.

own benefit and keep it beyond the reach of creditors." *United States v. Murray,* 217 F.3d 59, 65 (1st Cir. 2000) (internal citation omitted).

The second transfer, the surrender of Scott Baker's half-interest in the Hingham Property to Robyn Baker pursuant to the Separation Agreement, is more problematic. Although the second transfer boasts many of the badges of fraud in its own right,[15] Robyn Baker maintains that she gave adequate consideration for her husband's half-interest at the time of the divorce, namely by giving up any right to Scott Baker's interest in the last of his Planet Fitness gyms.[16] Because a material dispute of fact exists regarding the actual value of Scott Baker's business interests at the time the Separation Agreement was adopted by the Probate Court, the entry of summary judgment under § 5(a)(1) or § 5(a)(2) is precluded.[17] While it is

---

[15] The United States notes that, "through this [S]eparation [A]greement, Scott Baker was stripped of all assets while remaining personally liable for the approximate $875,000 mortgage on the personal residence." Pl.'s Mem. at 8. The transfer was also between two family members, and conducted at a time when Scott Baker knew he was facing a large tax liability that he would be unable to pay.

[16] Scott Baker testified that his business ventures, including the gym, were worth approximately $1 million at the time of the divorce and that he owned 50 percent of the gym. Baker testified that after the divorce he brought in two "money partners" who cheated him, rendering the gym ultimately worthless.

[17] The United States argues that the dispute is not "genuine" because neither of the Bakers has produced documentary evidence substantiating

true, as the government notes, that a "fraudulent intent . . . may be inferred from the facts and circumstances of a particular case," *Davis,* 869 F. Supp. at 52, citing *Citizens Bank & Trust Co. v. Rockingham Trailer Sales, Inc.,* 351 Mass. 457 (1966), this rule is pertinent to a finder-of-fact, and not a court sitting in *brevis* review.[18]

### *The Nominee Theory*

In the alternative, the United States alleges that Robyn Baker holds the Hingham Property as Scott Baker's nominee, and that there was, in reality, no conveyance effectuated at all, because Scott Baker still exercises control over the property and derives a benefit from it. The United States is

---

the value of Scott Baker's businesses. The argument misapprehends the moving party's burden of proof on a motion for summary judgment.

[18] Further, even if the court did draw an inference of fraudulent intent as a matter of law on the part of Scott Baker (given that he valued these assets at zero dollars in a later declaration to the IRS), the court would also have to find that Robyn Baker did not participate in the transfer in good-faith or did not give "reasonably equivalent value" in exchange. *See* Mass. Gen. Laws ch. 9A, §9(a) (a transfer under §5(a)(1) made with actual intent to defraud is "not voidable . . . against a person who took in good-faith **and** for a reasonably equivalent value. . . ."). *Cf. Alford v. Thibault*, 83 Mass,. App. Ct. 822, 828 (2013) ("A transfer, even if made with intent to defraud, is not deemed fraudulent in fact unless there has been a resulting diminution of the assets available to the creditor."). The United States asserts that Robyn Baker could not have taken the Hingham Property in good faith as she was aware of the tax liabilities and was no "innocent lamb." Pl.'s Mem. at 20. The court does not find that these unadorned assertions sufficient to dispose of the material disputes of fact on summary judgment.

permitted to collect a taxpayer's unpaid tax liabilities from property in the possession of a nominee because the taxpayer's continued domination and control over property is powerful evidence that there was "in truth and fact [] no transfer at all." *Higgins v. Smith,* 308 U.S. 473, 357-358 (1940); *see also G.M. Leasing Corp. v. United States,* 429 U.S. 338, 350 (1977) ("If petitioner was [taxpayer's] alter ego, it had no countervailing effect for purposes of his federal income tax . . . [and the IRS] could properly regard petitioner's assets as [taxpayer's] property subject to the lien under § 6321."). For the same reason that the court is unable to enter summary judgment on the bona fides of the second transfer, it is similarly unable to enter a *brevis* judgment on this theory as well.[19]

### *The Lien Tracing Theory*

The United States offers a third theory to justify enforcement of the lien that focuses solely on assets allegedly transferred subsequent to the first tax assessment date in May of 2009 (which was after the Bakers' divorce agreement and corresponding property transfer). When an assessment is recorded against a "person liable to pay any tax" who "neglects or refuses to pay the same after demand," a lien arises in favor of

---

[19] Robyn Baker also alleges that she lives in, benefits from, and makes financial decisions regarding the Hingham Property. The United States has not come forward with enough concrete evidence to rebut these assertions as a matter of law.

the United States against "all property and rights to property, whether real or personal, belonging to such person." 26 U.S.C. § 6321. Once the lien attaches to the taxpayer's property, it stays with the property, even if the property is transferred or converted. *See, e.g., United States v. Bess,* 357 U.S. 51, 57 (1958) ("The transfer of property subsequent to the attachment of the lien does not affect the lien, for 'it is of the very nature and essence of a lien, that no matter into whose hands the property goes, it passes *cum onere*.'") (internal citation omitted).

Thus, to the extent it is possible to "trace" the lien, that is, to follow the trail of the taxpayer's property to subsequently acquired substitute assets or proceeds, the lien attaches to the after-acquired property and may be enforced against the property no matter whose hands it is in. *See, e.g., In re Callahan,* 442 B.R. 1, 7 (D. Mass. 2010), quoting *Phelps v. United States*, 421 U.S. 330, 334-335 (1975) ("Once a tax lien attaches to property, '[t]he lien reattaches to the thing and to whatever is substituted for it. . . . The owner and the lien holder, whose claims have been wrongfully displaced, may follow the proceeds wherever they can *distinctly* trace them.") (emphasis in original).

The United States alleges that, since the date of the initial assessment, the Hingham Property has been paid for and maintained by assets and

earnings under the control of Scott Baker, thereby rendering the property subject to the tax lien to the extent such earnings and assets subject can be traced. Scott Baker used approximately $6,200 per month of his personal funds (which, after May 14, 2009, were subject to the tax liens arising from assessment) to make mortgage and property tax payments on the Hingham Property. Robyn Baker does not dispute this, noting that the mortgage has been paid from Scott Baker's personal funds "for as long as she can remember." RB Dep., 8:14-9:5. The United States argues that, even if the conveyances are not set aside (on the nominee or fraudulent conveyance theories), the United States has the right to enforce the federal tax liens on the Hingham Property to the extent it can trace Scott Baker's personal property to the maintenance of the mortgage on the property.

It is unlikely that the disputes of fact the Bakers have alleged with regard to the fraudulent conveyance and nominee theories would be relevant to defeat summary judgment on the lien tracing theory.[20] Unlike an attempt to enforce a lien on property allegedly fraudulently conveyed prior to attachment to a lien, an attempt to enforce a lien on property that was transferred or conveyed *after* a section 6321 lien attached, entails no factual inquiry into matters of intent or state of mind (and is also

_____

[20] Neither defendant addressed the United States' lien-tracing theory in opposing summary judgment.

definitively a matter of federal, not state, law). *See Bess*, 357 U.S. at 57 (noting that "state law is inoperative to prevent the attachment of liens created by federal statutes in favor of the United States"); *see also Don King Prods., Inc. v. Thomas,* 945 F.3d 529 (2d Cir. 1991) ("Only those persons specifically listed in the statute are entitled to priority over unrecorded federal tax liens.").

The obstacle to summary judgment on this theory, however, is the fact that the mortgage payments on the Hingham Property are being made by Scott Baker pursuant to a divorce decree entered by the Probate Court (which adopted the Bakers' prior Separation Agreement). While "it is not debatable that a tax lien imposed by a law of Congress, cannot, without the consent of Congress, be displaced by later liens imposed by authority of any state law or judicial decision," *State of Mich. v. United States*, 317 U.S. 338, 340 (1943), the divorce decree was entered prior to the assessments that gave rise to the liens at issue. The United States has not addressed the implications of this fact, and thus, any entry of summary judgment on this theory would be premature on the record now before the court.[21]

---

[21] The court also notes that the alleged equity traceable to encumbered funds ($378,000) appears to have been miscalculated the United States in its Memorandum. First, the amount was calculated using an assessment date of March 14, 2009 (the certified transcripts attached by the United States to its motion reflect that the first assessment was not

23

### *Tortious Conversion*

Finally, the United States seeks summary judgment on its claim against Robyn Baker personally for the tortious conversion of assets subject to a federal tax lien, for the amount of Scott Baker's property that she has appropriated for her own use in "derogation, diminution, and destruction of the superior interests of the United States." Compl. ¶ 49. The court cannot grant summary judgment on this count without making inappropriate determinations of disputed facts, including issues of credibility.[22]

### ORDER

For the foregoing reasons, the motion of the United States for summary judgment is <u>DENIED</u>. The Clerk is directed to set the case for trial on the issues identified by the court in this decision.

SO ORDERED.

/s/ Richard G. Stearns
UNITED STATES DISTRICT JUDGE

---

made until May 14, 2009). *See* Dkt. #22-7 at 26. Second, the parties represent that there is approximately $300,000 of equity currently in the Hingham property, so it cannot credibly be the view of the United States that the entirety of the $378,000 is traceable to equity in the property.

[22] The United States seeks a judgment of $1,157,000 against Robyn Baker on the tortious conversion count, but this sum has been calculated by the United States, at least in part, by assuming facts that are in dispute, as detailed above.