UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 13-cv-11078-RGS

UNITED STATES OF AMERICA

v.

SCOTT BAKER and ROBYN BAKER

FINDINGS OF FACT, RULINGS OF LAW,
AND ORDER AFTER A JURY-WAIVED TRIAL

August 17, 2015

STEARNS, J.

Based on the credible testimony and exhibits offered at trial, and the stipulations of the parties, I make the following findings of fact.

## FINDINGS OF FACT

1.      Scott (S.) Baker and Robyn (R.) Baker married on December 12, 1998.  Stipulation of Facts (SF), Dkt. #49 ¶ 3.

2.      They have two teenage children.  SF ¶ 4.

3.      S. Baker is a self-employed construction manager.  SF ¶ 2.

4.      S. Baker currently faces a federal tax liability in excess of $5 million.  Dkt. # 72.

5.      The Bakers filed joint federal income tax returns for the tax years 1999, 2000, and 2001.  SF ¶ 5.

6.     A "Son of BOSS" tax shelter scheme purported to reduce the Bakers' 2001 taxable income from \$1,114,449 to \$289,688.[1]  SF ¶ 9.

7.     In December of 2002, S. Baker, together with a friend and business partner, David Laird, sold eight Planet Fitness gyms to Bally Fitness for approximately \$15 million in Bally stock.  SF ¶ 10.  From the sale, S. Baker received some \$4.6 million in Bally stock, which he eventually sold for \$3.4 million in cash.  SF ¶ 11.

8.     In 2002, the Bakers filed separate tax returns.  SF ¶ 6.

9.     A second "Son of BOSS" tax shelter claimed on S. Baker's 2002 return reduced his tax liability to a purported net loss of \$2.5 million.  SF ¶ 12.  S. Baker claimed a 2002 tax refund of \$42,655.  He then amended his and R. Baker's joint 1997 through 2001 tax returns to claim additional refunds by carrying-back the uncredited portion of the purported 2002 loss.  SF ¶ 13.  As a result, the IRS refunded virtually all of the taxes the Bakers had paid in 1999, 2000, and 2001.  SF ¶ 14.

10.     S. Baker testified that in his mind the "Son of BOSS" tax shelter was perfectly legal and was "what everyone did."  Trial Transcript Day 2 (Tr. 2) at 49.

---

[1] For a description of the "Son of BOSS" (Bond Options Sales Strategy) tax shelter, *see Fid. Int'l Currency Advisor A Fund, LLC ex rel. Tax Matters Partner v. United States*, 661 F.3d 667 (1st Cir. 2011).

11.     On June 30, 2003, in executing the second "Son of BOSS" tax shelter, S. Baker established and became the Settlor of the "Scott Baker Family Trust" (Baker Trust), a Cayman Island Trust with a Royal Bank of Canada account.  S. Baker granted himself a one-third beneficial interest in the Trust.  The remaining beneficial interests were divided among R. Baker and the Bakers' two minor children.  SF ¶¶ 15-17.

12.     As the Settlor of the Baker Trust, S. Baker was vested with the power to appoint the initial Trustee and to appoint a successor at any time.  Ex. 1 at ¶ 14.  S. Baker also had the power to remove the Trustee without cause and to name or exclude the beneficiaries of the Trust.  Ex. 1 ¶¶ 17(d), 6(c) and 6(a).[2]

13.     S. Baker appointed the Royal Bank of Canada as the inaugural Trustee.  Ex. 1.

14.     S. Baker deposited the proceeds from the sale of the Bally stock in the Baker Trust.  Ex. 10; Ex. 71 at 28-29 (S. Baker Dep.).

---

[2] During his testimony, S. Baker professed ignorance of many of the Baker Trust's formalities.  Tr. 2 at 52-53.

15.     S. Baker later directed the Trustee to invest the corpus of the Baker Trust with International Management Associates (IMA), an Atlanta-based hedge fund.  Ex. 71 at 36 (S. Baker Dep.); SF ¶ 19.[3]

16.     On December 6, 2004, the Bakers entered into a Global Settlement Initiative agreement with the Internal Revenue Service (IRS), resolving tax claims arising from the Bakers' 2001 involvement with the first Son of BOSS tax shelter.  SF ¶ 26.  The Global Settlement Initiative program permitted taxpayers to resolve any outstanding tax debt before the commencement of an IRS enforcement action.  As consideration, the taxpayer received certain tax benefits and paid lower penalties.

17.     On August 22, 2005, the Bakers purchased a home located on Main Street in Hingham, Massachusetts (Hingham Property) as tenants by the entirety for $1,622,500.  SF ¶ 27.

18.     Also in August of 2005, the IRS opened an examination of S. Baker's 2002 tax return.  SF ¶ 28.

---

[3] The exact amount of the funds deposited with IMA is disputed.  S. Baker's notes indicate that a deposit of $3.8 million was paid into the Trust and then invested with IMA in 2003/2004.  Ex. 10.  The notes also show a deposit in 2004 into S. Baker's personal account, also with IMA, in the amount of $750,000.  *Id.*  In his testimony, S. Baker testified that the $750,000 represented the IRS refund.  Tr. 2 at 65.  The notes further indicate that in 2005, S. Baker withdrew the full $750,000 from the IMA account.  Ex. 10.

19.    S. Baker initially elected to participate in a second IRS Global Settlement Initiative, agreeing to pay $1.2 million in outstanding taxes.  SF ¶ 29.

20.    At some point in late 2005, the Bakers were made aware that the IMA hedge fund was, in effect, a "Ponzi" scheme and that the money invested by the Baker Trust had evaporated.  SF ¶ 20.

21.    On March 16, 2006, IMA filed for Chapter 11 bankruptcy protection.  *See Int'l Mgmt. Assocs., LLC*, 2007 WL 7141787 (Bankr. N.D. Ga. March 16, 2006).  The Bankruptcy Court appointed a Trustee to seek to marshal any of IMA's remaining assets for the benefit of IMA investors, including the Bakers.  *Id.*  On March 27, 2006, S. Baker was appointed to serve as one of seven members of a committee representing the investors. Tr. 2 at 70.  S. Baker retained a lawyer to represent him in the IMA bankruptcy proceedings.[4]

---

[4] In 2008, the Bakers were sued by the IMA Trustee for $724,000 of the amount that S. Baker withdrew from IMA in 2005. Ex. 125.  In his testimony, S. Baker claimed that the amount sought by the IMA Trustee was $132,000, of which he paid $28,000.  Tr. 2 at 66-69.  S. Baker denied ever owning a personal account at IMA or having $750,000 in liquid assets to withdraw.  Tr. 2 at 64-66, 101.

**2007**

22.   In early February of 2007, as part of the second Global Settlement Initiative, the IRS requested that S. Baker complete a Form 433-A listing all of his assets by no later than March 1, 2007.  Form 433-A is used by the IRS to collect information on a debtor's current assets when he or she claims an inability to pay the taxes owing.  The IRS uses the form to determine the amount that can reasonably be collected from the tax debtor, either in assets that can be levied or income that can support monthly payments under an Installment Agreement.  It is undisputed that the Bakers were at that time aware of the probability of a multi-million dollar tax assessment.  SF ¶¶ 30-31.

23.   On February 22, 2007, the Bakers established the S&R Realty Trust (S&R Trust), with R. Baker as Trustee. They transferred the title to the Hingham Property, by way of a quitclaim deed, to the S&R Trust.  The same day, before recording the transfer, the Bakers remortgaged the Hingham Property, naming S. Baker as the sole mortgagor.  SF ¶¶ 32-34. R. Baker testified that the S&R Trust had no purpose other than to hold the title to the Hingham Property, its only asset.  SF ¶ 39.

24.   R. Baker attested that the transfer of title was "in contemplation of divorce for the purpose of easing transfer of the property and to protect it

against possible lawsuits from Scott's construction clients."  Ex. 55 at 21. She also testified that she "didn't want any of Scott's customers to put any type of lien or anything on the house that would cause it not to have the same value." Ex. 72 at 40 (R. Baker Dep.).

25.   S. Baker similarly attested that "[b]y February 2007 it had become clear to me that my marriage to Robyn Baker might not last," and "I had come to believe that my construction business made me a potential target for litigation, from customers, subcontractors, or vendors." Ex. 56 at 3.

26.   The Bakers did not identify any actual or threatened litigation involving S. Baker's construction clients.

27.   Also on February 22, 2007, the Bakers established a second realty trust, the C&S Realty Trust (C&S Trust); (C&S represents the first name initials of the Bakers' minor children).  R. Baker was the sole trustee of C&S Trust.  The principal beneficiaries of the C&S Realty Trust were the Baker's two minor children.[5]  The Bakers transferred property located at 253 Humarock Beach Road in Scituate, Massachusetts (Humarock Property) into the C&S Trust.  R. Baker attested that the C&S Trust was formed "to protect a beach house at 253 Humarock Beach Road from any

---

[5] Neither party offered the schedule of beneficiaries into evidence.

potential construction people that may have had an issue with Scott."  SF ¶¶ 35-39.

28.    R. Baker testified that S. Baker did not receive any consideration for transferring his half interest in either the Hingham or the Humarock Property into the S&R or C&S Trusts.  SF ¶ 40.

29.    On March 5, 2007, the Bakers recorded the deeds transferring the Hingham Property to the S&R Trust and the Humarock Property to the C&S Trust.

30.    On March 6, 2007, the Bakers completed and signed IRS Form 433-A as requested.  The Bakers listed the Hingham Property and the Humarock Property in the real estate section of the form.  SF ¶¶ 48-50.

31.    According to the Form 433-A, the Hingham Property was encumbered by a $1,155,000 mortgage.  Ex. 63 at 4.  The form also identified two properties in New Hampshire with a combined equity value of $200,000 (New Hampshire Properties).

32.    At some point in 2007, the IRS disqualified S. Baker as eligible for the second Global Settlement Initiative because of his inability to pay the agreed amount.  SF ¶ 29; Ex. 83 (notes from an IRS investigation revealing a negative cash flow).

33.    On November 17, 2007, R. Baker sold the Humarock Property and deposited the proceeds ($433,000) into a South Shore Bank account owned by C&S Trust.   SF ¶ 42.   Several months later, she withdrew $300,000 from the account and used it to pay down an outstanding equity line of credit on the Hingham Property.  SF ¶ 44.  R. Baker testified that she used the remaining funds in the South Shore Bank account to pay for living expenses, credit card bills, and her children's activities.  SF ¶ 45.  She also wrote numerous checks to cover expenses related to maintenance of the Hingham Property.  Exs. 22, 24, 28-29.

### 2008

34.    In January of 2008, a $258,801 payment was made by the C&S Trust to IndyMac Bank against the mortgage on the Hingham Property.  SF ¶ 51.  At the time of the trial, the C&S Trust no longer existed.  SF ¶ 46.

35.    On January 11, 2008, the Bakers filed for divorce.  SF ¶ 52.

36.    One day prior, on January 10, 2008, the Bakers signed a Separation Agreement that was eventually incorporated into the divorce judgment.  Ex. 41.

37.    R. Baker was represented by an attorney in the divorce, although she testified that she did not remember who drafted the Separation Agreement. Ex. 72 at 59 (R. Baker Dep.).  S. Baker testified that

9

he did not have the funds to hire an attorney to represent him in the divorce.  Ex. 71 at 63 (S. Baker Dep.).

38.   The Separation Agreement stated that "irreconcilable differences [had] arisen and continue to exist between the parties with no chance of reconciliation since March 1, 2007," and that the Agreement had been entered "in order to settle all claims of the parties and all other matters which should be settled in view of the pending complaint for divorce."  Ex. 41 at 1.

39.   The Agreement provided that the Bakers would retain joint physical and legal custody of their two minor children.  *Id.* at 1-2.

40.   Article II of the Agreement, entitled "Financial Arrangements," made provisions for health insurance and other family expenses, while explicitly noting that the Agreement obligated neither party to pay child support or alimony.   *Id.* at 2-5.

41.   Article III of the Agreement, entitled "Real Estate," divided the Bakers' real estate holdings.  It conferred sole ownership of the Hingham Property on R. Baker, while noting that the property "is presently held by S&R Realty Trust for the benefit of the minor children." She also received the New Hampshire Properties.  *Id.* at 5.  The Bakers estimated the New Hampshire Properties to be worth $200,000 in March of 2007.  Ex. 63; Tr.

10

2 at 7.  The most recent appraisal of the Hingham Property valued it at $1.6 million (in February of 2007), although R. Baker testified that as of January of 2008 she doubted whether this valuation was accurate.  Ex. 32; Ex. 54 at 2; Tr. 2 at 9.

42.     Article III further required that S. Baker assume the mortgage on the Hingham Property and make all monthly payments (while waiving "all rights in the Marital Home").  *Id.*  The Agreement, however, gave S. Baker permission to reside in the Hingham Property, while R. Baker assumed responsibility for utility payments and routine repairs.  *Id.* at 5-6.  The Bakers agreed to "share equally" the cost of any capital improvements to the home exceeding $500.  Ex. 41 at 6.

43.     The Agreement provided that the Bakers share equally a "Rockland Trust joint bank account."  At the time, the account was valued at $60,000.  *Id.*

44.     R. Baker received a boat valued at $21,000, a car valued at $14,000, two motorcycles, and "any monies stolen from the parties."  Tr. 2 at 81-82; Ex. 41 at 6, Ex. 63 at 3; SF ¶ 63.

45.     S. Baker received a Chevrolet pickup truck, construction trailers, a Kabota tractor, and the contents of a toolshed.  Ex. 41 at 6.

11

46.    With regard to outstanding debts, the Agreement provided that, in addition to the mortgage on the Hingham Property, S. Baker was to assume all "marital credit card debt," and all liabilities attaching to his construction business.   Ex. 41 at 7.   At the time, the mortgage on the Hingham Property amounted to approximately $875,000, the marital credit card debt totaled approximately $37,000, and the construction business liabilities were estimated at $450,000.[6]  R. Baker "agree[d] to help [S. Baker] be successful in any business ventures he may wish to pursue." *Id.* at 6.    After the divorce decree, S. Baker regularly made monthly payments to R. Baker of $6,200, often in cash, to apply to the mortgage. Ex. 31, Tr. 1 at 124.[7]  According to S. Baker's testimony, "I was making around $80,000 a year, which after taxes, is about five or six grand a month, which I was giving $6,200 a month [to R. Baker]." Tr. 2 at 125.

47.    S. Baker received sole ownership of his business ventures.   At the time, these consisted of a Planet Fitness gym in Scarsdale, New York, which he owned together with David Laird.    *Id.* at 89 & 111.   S. Baker

[6] At trial, S. Baker disputed the existence of any marital credit card debt.  Tr. 2 at 83.

[7] R. Baker testified that when she did not receive the full monthly stipend from S. Baker, she paid the balance due on the mortgage with her own money.  Tr. 2 at 145.

12

testified that by March 27, 2007, his ownership interest in the gym had been reduced from a 50 percent to a 25 percent share. *Id.* at 116.

48.     R. Baker testified at her deposition that "Scott was trying to sell [the gym] to the owner of Planet Fitness and it had a value of $250,000." Ex. 72 at 33 (R. Baker Dep.).   In response to a government discovery request, R. Baker produced an Internet article, which she described as "regarding the sale of a group of gyms, including the Scarsdale Gym, valuing the gym at approximately $320,000." Ex. 55 at 32.   The article, however, does not mention the Scarsdale gym. *Id.* at 100-102.  At trial, R. Baker acknowledged that she did not know "how I came up with the figure or if my attorney came up with the figure."  Trial Transcript Day 1 (Tr. 1) at 166.

49.     S. Baker, for his part, agreed with R. Baker's valuation of the gym business. In his bankruptcy petition, he stated that the business was worth at least $1 million at the time of the divorce, meaning that his 25% interest was worth $250,000.  Ex. 42 ¶ 22.[8]

---

[8] S. Baker testified that he thought that the divorce agreement was unfair to R. Baker because she ended up with a heavily mortgaged house, while he received half (sic) of a business worth $1 million that was "eight months away from turning a profit.  The average Planet Fitness, if you go on the website, produces 5 or $600,000 a year."  Tr. 2 at 89.

50.    The IRS Form 433-A that the Bakers submitted under penalties of perjury on March 6, 2007, does not attribute any interest in Planet Fitness Scarsdale to S. Baker.  Ex. 63.  S. Baker's 2007 federal income tax return claimed a $210,523 loss on his gym business, while the 2008 return claimed a loss of $54,735.  Exs. 89-90.[9]

51.    Prior to the final divorce decree, S. Baker was sued by Eastern Bank for $450,000 in his capacity as a guarantor on a loan to Planet Fitness Scarsdale.  Tr. 2 at 85-86.  The loan was in default because, according to S. Baker, "bills [owed by Planet Fitness Scarsdale] weren't being paid."  *Id.*  S. Baker further testified that in addition to the Eastern Bank loan, Planet Fitness Scarsdale owed $650,000 to ITT Leasing Life Fitness for gym equipment.  *Id.* at 115.

52.    Neither of the Bakers obtained an independent appraisal of the Planet Fitness Scarsdale gym.  Tr. 1 at 162; Ex. 72 at 33 (R. Baker Dep.).

---

[9] The balance sheet attached to Planet Fitness Scarsdale's 2006 federal taxes indicates that the business had a negative equity.  Ex. 95.  A Planet Fitness in Manchester, New Hampshire, owned by S. Baker and David Laird, "shut down" in 2006 because of a "lack of money." Tr. 1 at 173. R. Baker testified that she and S. Baker had to "close down" Planet Fitness Manchester because the club was "hemorrhaging money" and was "taking a lot of marital funds." Tr. 2 at 137.

53.     On February 28, 2008, the Probate Court entered a judgment incorporating the Bakers' Separation Agreement and giving it "the full force and effect of an order of this Court."  SF ¶ 64.

54.     The divorce became final on May 29, 2008.  SF ¶ 65.

55.     Following the divorce, S. Baker continued to reside in the Hingham Property; he remained a named insured on the Property; and his name remained on numerous bills for the Property, including those for property taxes and utilities such as gas, electrical, and water.  Tr. 2 at 107; Exs. 32-38, 67 & 69.

56.     R. Baker testified that she was motivated to seek a divorce because of the financial stresses that she and S. Baker were experiencing. Tr. 2 at 135-138.  She also stated that she was concerned about S. Baker's poor "decision-making." *Id.* at 139.

57.     Paula Colburn, who testified at trial, stated that she learned from R. Baker in 2008 of R. Baker's intention to seek a divorce.  Colburn had known R. Baker since high school.  Tr. 2 at 130.  Colburn testified that she and R. Baker spoke every Thursday, and at the time of the divorce, R. Baker was under stress from "years of, you know, bad decisions that – financial decisions that Scott had made that put her in a very compromised situation.  And, you know, the IRS was coming after both of them.  She

didn't know how she was going to provide a house and a stable home for her family, her two children.  Just a lot of it, and it really just drove a wedge between she and Scott."  *Id.* at 132.

58.    On June 3, 2008, after the divorce was finalized, R. Baker submitted a request to IndyMac Bank for a modification of the mortgage on the Hingham Property.  She included a statement attributed to S. Baker as follows: "I was the owner of a business and sold the business to Bally Total Fitness and retired with my wife and two kids."  Tr. 1 at 134-135.[10]

59.    S. Baker's federal tax return for 2008 listed a "partnership interest in [Planet Fitness Scarsdale]" that "was sold [in 2008] for secured creditor debt."  Ex. 90 at 8.  S. Baker testified that Planet Fitness Scarsdale was "stolen" from him in a lawsuit brought by his "money" partners in June of 2008.  Tr. 2 at 94, 97.

60.    R. Baker received deficiency notices on December 18 and 31, 2008, stating that she was liable for some portion of the refund that S. Baker had received on the couple's joint tax returns for the years 1999, 2000, and 2001.  Ex. 53.

---

[10] R. Baker explained that she "copied and pasted a bio [of S. Baker] and placed it in his mortgage modification."  Tr. 1 at 135.

**2009**

61.     On March 23, 2009, R. Baker filed a petition in the United States Tax Court contesting the proposed assessment against her.  The Tax Court subsequently entered a judgment in her favor.  Ex. 53.[11]

62.     On February 10, 2009, the Baker Trust filed a proof of claim for $3,260,609.83, in the IMA bankruptcy proceeding.  Ex. 8; Ex. 42 ¶ 12.  S. Baker testified that the proof of claim forms were prepared by the attorney he had hired to represent him in the IMA bankruptcy proceeding.  Ex. 71 at 64 (S. Baker Dep.).  S. Baker testified that the claim omitted the $750,000 that he had deposited "at the end of that year" (presumably 2004).  Tr. 2 at 72.

63.     On May 11, 2009, a press release announcing R. Baker's hiring as a "relationship consultant" by a dating service called "The Right One"

---

[11] R. Baker testified that at the time of the divorce she believed that she was jointly liable for S. Baker's tax debt.  Tr. 1 at 151; Tr. 2 at 138.  R. Baker stated in her petition to the Tax Court that she received deficiency notices stating that she was liable for portions of S. Baker's debt in December of 2008, that is, six months after the final divorce judgment had entered.  It is undisputed that the tax debt at issue arose from S. Baker's individually filed 2002 federal tax return.  Moreover, the Separation Agreement provided that S. Baker was "responsible for the filing and payment of all prior business and personal tax returns of the parties and he shall indemnify the Wife against, and hold her harmless from, all tax payments, and all expenses and damages, including the removal of all tax liens, in connection with any Prior Returns."  Ex. 41 at 7.

described her as "resid[ing] in Hingham with her husband and two children." Ex. 44; SF ¶ 66.[12]  On June 18, 2009, R. Baker's Twitter account contained a picture of her in a casual family pose with S. Baker and her two children captioned, "Loving My Life."[13]  Ex. 119 (Twitter post dated June 16, 2009).[14]

64.    At his deposition, S. Baker testified that he has never told his children that he and R. Baker are divorced and that he does not know if they are aware of the separation.  Ex. 71 at 57-58 (S. Baker Dep.).

## 2010-2013

65.    R. Baker met Lori Leo in the spring of 2010 and the two became friends "right away."  Tr. 1 at 9.  When R. Baker introduced Leo's husband,

---

[12] R. Baker testified that she had asked her employer to change the reference to her husband, but that the request was refused.  Tr. 2 at 35-36.

[13] R. Baker testified that the picture dated from 2005, and that it was the only picture of her family that she had available to post.  Tr. 1 at 125-126.  The photograph was also included in a promotional campaign touting R. Baker's personal development business.  Tr. 2 at 26-27.

[14] As of January 7, 2010, R. Baker on her business website, betterspaces.net, stated that she was the owner and operator of "Better Spaces" and described herself as follows:  "My name is Robyn Baker and I live with my husband and two children in Hingham, Massachusetts. . . . My husband is a builder . . . ."  Ex. 43.  At trial, R. Baker testified that she designed and posted this website in 2005, prior to the divorce.  Tr. 2 at 12-13 & 34.

Michael Theriault, to S. Baker, R. Baker referred to S. Baker as her husband.  *Id.* at 79.  Both Leo and Theriault testified that throughout the early years of their friendship with the Bakers they believed that the Bakers were a married couple.  *Id.* at 11 & 83.

66.    When she first became acquainted with R. Baker, Leo assumed that she was married to S. Baker because "they lived together.  They had two children together and we did things together.  We went out to dinners together.  They came over to our house for dinner.  They engaged in holidays with us and ski trips and camping."  *Id.* at 11-12.

67.    In June of 2010, R. Baker was hired by Leo to work at her physician recruiting company.  *Id.* at 7-8.

68.    In March of 2011, Leo, her husband, and their son (the Leo family) moved next door to R. Baker on Main Street in Hingham.  *Id.* at 6.

69.    Between 2010 and 2014, the Leo family and the Bakers became very close.  R. Baker described the Leo family as "our extended family."  Ex. 119 (e-mail dated March 29, 2013, subject: "Easter").[15]  Theriault testified

---

[15] The e-mails in Exhibit 119 were produced by Leo, not R. Baker, although R. Baker had been requested during discovery to produce all documents tending to show that she remained married to S. Baker.  R. Baker testified that Leo was at fault, stating "I went to Lori Leo, and I told Lori Leo that I needed these documents." Tr. 2 at 32-34.

that he was very close to both Bakers.  When S. Baker's father died, Theriault accompanied S. Baker to the hospital.  Tr. 1 at 95.

70.    The Bakers and the Leo family socialized on a regular basis. They went out to dinner, "many, many, many times." *Id.* at 10; *see also*, *id.* at 138.  Theriault estimated that over the course of four years they ate dinner together approximately 250 times.  *Id.* at 80.  Most often the children would accompany them, but occasionally they would go out to eat as couples.  *Id.*  Theriault noted that whenever they went out, S. Baker would pay his share of the bill with cash.  *Id.* at 12; *see also*, *id.* at 82.

71.    In describing the Bakers' physical relationship, Leo testified that "[w]hen, say, we went out to dinner, they sat next to each other in the back.  If there were three seats in the back, they choose the two next to each other, held hands, just normal husband and wife." *Id.* at 11.  Theriault also described the Bakers' relationship as physically affectionate.  *Id.* at 80-81.

72.    The Bakers and the Leo family vacationed frequently together. Leo estimated that three or four times during the winter season, the Bakers would join the Leo family at a ski chalet that Leo rents with her sister in New Hampshire.  *Id.* at 12.  The Bakers would stay in the same room with a single bed.  *Id.*; *see also*, Ex. 120 (photograph of Leo family with R. Baker, S. Baker, and the children at the chalet); Ex. 119 (e-mail dated Dec. 31,

2011, subject: "When will you be home?"; e-mail dated Jan. 12, 2012, subject: "Sunapee eNews . . ."). Theriault estimated that the Bakers took some 15 ski trips with the Leo family. Tr. 1 at 81.

73.     The Bakers and the Leo family would also go on camping trips together. Ex. 119 (e-mail dated June 28, 2012, subject: "next week vacation days"); Tr. 1 at 143-145. On these trips, the Bakers would sleep in their camper. When the Bakers purchased the camper in 2011, R. Baker referred to it as a joint purchase. Ex. 119 (e-mail dated Dec. 1, 2011, subject: "Unit 30582 Link") ("We can have the trailer we want . . . I think we should seriously consider it . . . ."). The camper had two bunk beds and a master bedroom, leading Leo to assume that the Bakers shared a bed in their camper as well. Tr. 1 at 15.

74.     The Bakers also celebrated holidays with the Leo family. Although the two families did not celebrate Christmas together because the Bakers "would take family trips away," the two families usually met for Easter and Thanksgiving dinners. *Id.* at 16, 60-62 and 148-149; *see also*, Ex. 121 (photograph of Thanksgiving dinner including the Bakers with Leo's extended family); Ex. 122 (photograph of the Bakers smiling together on same holiday).

75.    Despite the divorce decree, the Bakers took vacation trips together during the Christmas holidays, including one trip to Aruba and another to Mexico. Tr. 1 at 16 & 145; *see also* Ex. 119 (e-mail dated Dec. 31, 2011, subject: "When will you be home?"; e-mail dated Nov. 26, 2012, subject: "December Vacation Request").  On another occasion, they took a trip to Florida together.  Tr. 1 at 17.  Leo testified that the Bakers also went on a motorcycle trip together in August of 2010.  *Id.* at 41.  In 2011, the Bakers rented a home together in Woodstock.  Ex. 119 (e-mail dated February 18, 2011, subject: "Monday").

76.    Leo visited the Baker home often where she observed only one master bedroom.  Neither of the Bakers ever referred to another bedroom as belonging to S. Baker. Tr. 1 at 20.  Leo had intimate conversations with R. Baker that led her to believe that the Bakers continued to engage in sexual relations.  *Id.* at 22-23.

77.    Leo testified that during the time they remained friends, the Bakers undertook an extensive renovation of their home, redoing the kitchen, moving a bathroom, adding another bathroom, and remodeling a bedroom.  *Id.* at 21.  Theriault testified that based on his experience in the construction industry, the renovations would have cost around $150,000. *Id.* at 86.

22

78.     S. Baker arranged to store the Bakers' boat on the Leo family's farm.  *Id.* at 26-27.  S. Baker at one point negotiated the sale of the boat to Theriault, although the sale fell through because of an IRS lien.  *Id.* at 92-93.  According to an official record from the Massachusetts Executive Office of Environmental Affairs, as of September of 2010, S. Baker was still listed as the owner of the boat.  Ex. 126.  The Bakers also stored gym equipment on the Leo family's property.  *Id.* at 27-28.  Theriault testified that the Bakers kept assets on other people's property as well. Tr. 1 at 94.

79.     While employed by Leo, R. Baker repeatedly held S. Baker out as her husband.  For example, in a series of exchanges with Bruce Moran, a client of Leo's, R. Baker referred to S. Baker as her husband.  Ex. 119 (e-mails dated July 7, 2011).  Moran also referred to S. Baker as R. Baker's husband, an impression that R. Baker failed to correct.  *Id.* (e-mails dated July 6 & 14 2011, no subject).[16]  Similarly, in canceling a meeting with a client in 2013, R. Baker wrote, "I am going to have to cancel lunch on Friday.  My husband and I are going to take our kids away for the weekend as it is school vacation and they have been fending for themselves all week while we have been working."  *Id.* (e-mail dated April 18, 2013, subject:

---

[16] R. Baker testified that in professional relationships she thought it easier not to have to explain that S. Baker was her ex-husband. Tr. 2 at 27-28.

PrimaCARE).[17]  In another 2013 e-mail to Leo recounting a conflict she had had with a fellow employee, R. Baker referred to S. Baker twice as her husband ("I heard Josef Wagner yelling obscenities about me and my husband," and "I called my husband and let him know what I heard and told him what Josef had said.").  *Id.* (e-mail dated March 12, 2013, subject: "Wagner").[18]

80.    S. Baker attended holiday parties at her workplace as R. Baker's "significant other."  Ex. 119 (e-mail dated Dec. 2, 2013, subject: "Christmas Party").

81.    When S. Baker took R. Baker to lunch on her birthday in 2011, R.  Baker enthused that "[m]y birthday is getting better."  Ex. 119 (e-mail dated July 6, 2011, subject: "Lunch").

82.    Leo testified that R. Baker had "a problem with honesty."  Tr. 1 at 38.  When asked the basis of this opinion, Leo testified, "I would say these things to her and then my husband would say, 'Why do you say that?' And I would call him on it and say, 'I didn't say that.'  And I certainly didn't

---

[17] R. Baker testified that she referred to S. Baker as her husband in this e-mail in order to discourage this particular client from asking her on "dates."  Tr. 2 at 30-31.

[18] R. Baker disputes having written this e-mail, alleging instead that Theriault composed it and forced her to sign it.  Tr. 1 at 133-134; Tr. 2 at 31. Theriault denies this.  Tr. 1 at 174.

say it like that.   So, there were numerous times like that and numerous times that she would say employees would say things and I would sit back and, you know, scratch my head, gosh they didn't – I don't know.   They didn't appear to be people who talked like that.   So, I always was – you know, when you're questioning, questioning, but you tend to let things go. You tend to not – gosh, you know, she's a friend."   *Id.* at 38.

83.   In response to a question asked at trial, "Are you an honest person?" R. Baker answered, "I am an honest person.   I have lied before." *Id.* at 128.   Later she repeated, "I said that I have lied."   *Id.* at 135.

84.   In addition to continuing to live together and hold themselves out as married, the Bakers engaged in business transactions together.   One such transaction was Cambridge Fitness, LLC.   *Id.* at 149.   This was to be a gym built by S. Baker and operated by R. Baker.   On May 7, 2010, R. Baker was named the registered agent and manager of Cambridge Fitness.   *Id.* at 150.   On May 13, 2010, R. Baker opened a bank account for Cambridge Fitness at the South Shore Bank. *Id.*   R. Baker was the sole signatory on the account.   *Id.*   R. Baker deposited a $100,000 settlement from litigation with Cambridge Fitness's landlord in this account and later withdrew it in cash. *Id.* at 151.

85.    In October of 2012, S. Baker removed the Royal Bank of Canada as Trustee of the Baker Trust and named R. Baker in its stead.  *Id.* at 55; Ex. 2.  S. Baker also replaced the trust protector, David Laird, with a new nominee, Stephen Meneely.  *Id.* at 57; Ex. 4.[19]

86.    On November 29, 2012, the IMA bankruptcy Trustee issued a check to the Baker Trust in the amount of $202,561.91 (IMA payout funds) and mailed it to S. Baker.  Exs. 8-9; SF ¶¶ 21 & 63.  S. Baker testified that he found out that a distribution had been made "[o]nly when I saw the check. I was flabbergasted that money came back three years later from something I thought had nothing."  Tr. 2 at 104-105.

87.    R. Baker testified that she had invested the entire $202,000 into a company called Design Decisions owned by a friend, Leslie Smith. SF ¶ 22.  Smith hired S. Baker to do construction on a home being built by Design Decisions, and when the home was sold, R. Baker received a return on the "portion that I invested."  SF ¶ 23.  R. Baker further stated that she reinvested the money with Design Decisions "[s]o that Scott could remain

---

[19] In explanation for his authority to do so, S. Baker testified that the Royal Bank of Canada gave him "permission" to take control of the Baker Trust, "and to try to get back and recover any assets . . . that were outstanding."  Tr. 2 at 54.

employed, have a job, be able to work, and hopefully earn more money on the money I gave [Smith]."  SF ¶ 24.

88.    The agreement with Smith was never reduced to writing.  Tr. 2 at 23.  When R. Baker gave Smith the investment money, she testified that she did so in $9,000 increments because she "didn't want the IRS to take my money."  *Id*. at 23-25; *see also*, Exs. 86-87.

89.    A second check for $84,000 was sent by the IMA bankruptcy Trustee to R. Baker in her capacity as Trustee of the Baker Trust.  *Id*. at 18. She testified at her deposition that she used this money to pay her own and S. Baker's legal fees.  SF ¶ 25.

## 2014

90.    In July of 2014, R. Baker left employment at Leo's company and went to work for a competitor.  Tr. 1 at 32.  Prior to her departure, Leo had asked R. Baker about her plans.  R. Baker told Leo that she wanted to spend time with her children and that "she ha[d] been working a lot and she wanted to now be a mother and a wife and be home with her children and not working."  *Id*.  Leo offered to let R. Baker work from home so as to allow her more time with her family.  *Id*.  Instead, Leo learned a few weeks later that R. Baker had left "to work for – not only a competitor, but a gentleman who wanted to buy my company."  *Id*.  R. Baker had met this individual in

May of 2014 while on a business trip to a trade show with Leo.  *Id.* at 35-37.
R. Baker had asked Leo's competitor what his medical recruiters were paid
and when she found out that the amount was considerably more than she
was paid, according to Leo she appeared "to salivate."  *Id.* at 36 (Leo
demonstrated her interpretation of R. Baker's reaction for the court).

91.    Leo believes that before R. Baker switched jobs, she removed
the executed copy of her non-compete agreement from Leo's office files.  *Id.*
at 33-35; *see also*, *id.* at 85.  Theriault testified that after R. Baker left his
wife's company he called her and told her that she was "an F'ing gold
digger"; he also said, "I know exactly what you did and what you're up to
here."  *Id.* at 104.  Leo was asked if she still considered R. Baker "a friend at
this point," to which Leo replied "Well, no, because shortly thereafter – I
mean, her husband, you know, severely assaulted my husband.  So, things
weren't going in the right direction."  *Id.* at 37

92.    This latter testimony referred to an event that occurred in
August of 2014.  *Id.* at 29.  S. Baker was working at a construction site on
Main Street in Hingham.  *Id.* at 96.  Theriault came to the site to see S.
Baker.  *Id.*   Theriault waited off to the side while S. Baker finished a
conversation with someone else.  As Theriault was looking in the other
direction, "the next thing I know, he came this way, and I'm blind on the

right side, and I was sucker punched, knocked to the ground and beaten and my head was hit back and forth." *Id*.  S. Baker gouged out Theriault's artificial eye and tried to do the same to Theriault's good eye.  *Id*.  Theriault was hospitalized with extensive injuries as a result of the assault. *Id*. at 29-30.   Criminal charges were filed against S. Baker (and are still pending). *Id*. at 98.   Theriault testified that he believed S. Baker assaulted him because of "this case here . . . . The only thing that came out of his mouth was the fact that, 'You're going against me.  You're testifying against me in the IRS case.'" *Id*.

93.   In November of 2014, Leo learned that R. Baker had had a sexual liaison with her husband.   *Id*. at 39.  Leo was made aware of the affair after R. Baker sent a letter to Leo alleging that Theriault had forced her into nonconsensual sexual relationship.  *Id*. at 39-40.  Throughout the time that R. Baker alleged that Leo's husband was forcing her to have sex with him, Leo considered R. Baker to be a friend.  *Id*. at 41.

94.   Theriault testified that the relationship began sometime in 2013 when R. Baker delivered pieces of a broken chandelier to Theriault and that she "came down to the house dressed very seductively in a sport outfit . . . , and it was quite apparent that there was a little bit more motivation than just putting together the chandelier and one thing led to another thing."  *Id*.

at 108.  He testified that the relationship was at R. Baker's insistence, that he never did anything to physically hurt R. Baker, nor did he ever offer to alter his testimony for her.  *Id.* at 108.

95.    Leo testified that "for me, that was the ultimate deception because I trusted her.  I trusted her as a friend, and I just – I just never would have thought that somebody would do these things, and call me naïve that I didn't see this coming." *Id.* at 43-44.

96.    S. Baker testified that he no longer resides at the Hingham Property.  He said that a friend had taken him in because he could not afford both the monthly mortgage payment on the Hingham Property and rent for an apartment, but that his plan "all along has been to leave as soon as I had a place to go to."  Tr. 2 at 107.

## CLAIMS OF THE PARTIES

1.    The government proceeds principally on a theory of fraudulent transfer and asks this court to forfeit S. Baker's interest in the Hingham Property, New Hampshire Properties and IMA payout funds transferred to R. Baker.[20]

---

[20] The United States argues two more attenuated theories of liability. The first is a nominee theory, which "allows for the possibility that the true owner of a parcel of land may be someone other than the record owner." *Dalton v. C.I.R.*, 682 F.3d 149, 157 (1st Cir. 2012).  Under this theory, if proven, S. Baker is the true owner of the Hingham Property, and the

2.      The government also argues that the tax liens in place against S. Baker attach to and should be enforced against the Hingham Property, New Hampshire Properties and IMA payout funds.

3.      The Bakers ask this court to give preclusive effect to the divorce judgment entered on May 29, 2008 and award the Hingham Property, New Hampshire Properties and the IMA payout funds in their entirety to R. Baker.

## RULINGS OF LAW

1.      "The government has the burden of proving its right to a lien," but once a valid tax lien is proven then the tax payer has "the burden of proof to discharge it." *In re Callahan*, 442 B.R. 1, 9 (D. Mass. 2010).

2.      "[I]n the application of a federal revenue act, state law controls in determining the nature of the legal interest which the taxpayer had in the

purported transfer of title pursuant to the divorce settlement is of no effect. The government's second theory is an even more rarified variant commonly referred to as "lien tracing." Under this theory, once a lien is placed on a property, "[t]he lien reattaches to the thing and to whatever is substituted for it . . . . The owner and the lien holder, whose claims have been wrongfully displaced, may follow the proceeds wherever they can distinctly trace them." *In re Callahan*, 442 B.R. 1, 7 (D. Mass. 2010). Under this theory, the IRS argues that it is entitled to impress a lien on all of the funds S. Baker paid towards the mortgage on the Hingham Property. While both of these theories are plausible, where a round peg fits neatly into a round hole, little is gained by attempting to hammer it into a square hole, even though it might well fit.

property . . . sought to be reached by the statute," even though federal law "must prevail no matter what name is given to [an] interest or right by state law." *Morgan v. Comm'r*, 309 U.S. 78, 81-82 (1940).

3.     The analysis of the United States' claim of a fraudulent transfer of assets begins with the Massachusetts Uniform Fraudulent Transfer Act (UFTA).  The UFTA, Mass. Gen. Laws ch. 109A, § 5(a), states:

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>> (1) with actual intent to hinder, delay or defraud any creditor of the debtor; **or**
>> (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, **and** the debtor . . . intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

(emphasis added)

4.     "'[I]t is often impracticable, on direct evidence, to demonstrate an actual intent to hinder, delay or defraud creditors.'  Thus, courts frequently infer fraudulent intent from the circumstances surrounding a transfer, placing particular emphasis on certain indicia or badges of fraud." *F.D.I.C. v. Anchor Props.*, 13 F.3d 27, 32 (1st Cir. 1994) (internal citations omitted).  "[T]he confluence of several [badges of fraud] can constitute conclusive evidence of an actual intent to defraud, absent 'significantly

clear' evidence of a legitimate supervening purpose." *Id.* at 32 (citations omitted).  Moreover, the phrase "to hinder, delay, or defraud" is to be read in its natural disjunctive sense.  Thus, proof of an "intent to defraud is not [always] necessary, but rather an intent to hinder or delay is sufficient for a finding of liability." *Davis v. United States*, 869 F. Supp. 49, 52 (D. Mass. 1994), citing *Joseph P. Manning Co. v. Shinopoulous*, 317 Mass. 97, 99 (1944).

5.    Massachusetts has enumerated eleven factors to consider in determining an actual intent to defraud.  Section 5(b) of the UFTA directs that consideration be given to whether:

> (1) the transfer or obligation was to an insider;
> (2) the debtor retained possession or control of the property transferred after the transfer;
> (3) the transfer or obligation was disclosed or concealed;
> (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
> (5) the transfer was of substantially all the debtor's assets;
> (6) the debtor absconded;
> (7) the debtor removed or concealed assets;
> (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
> (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
> (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and
> (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Mass. Gen. Laws ch. 109A, § 5(b).

33

6.    In fashioning remedies under the UFTA, a court must also be sensitive to the strong Massachusetts public policy of protecting the interests of a non-debtor spouse. *Bakwin v. Mardirosian*, 467 Mass. 631, 638 (2014).

7.    The actual intent provisions of the UFTA apply to divorce settlements even after reduction to judgment. *See, e.g.*, *Scholes v. Lehmann*, 56 F.3d 750, 758-759 (7th Cir. 1995); *Citizens State Bank Norwood Young Am. v. Brown*, 849 N.W.2d 55 (Minn. 2014); *Canty v. Otto*, 304 Conn. 546 (2012); *Estes v. Titus*, 481 Mich. 573 (2008); *Meija v. Reed*, 31 Cal. 4th 657 (2003).  The acceptance of a separation agreement by a judge in a divorce proceeding as fair among the two parties does not "represent a determination that the agreement perpetrates no fraud upon the creditors of one spouse, particularly where the claims of creditors are not made known to the court." *In re Chevrie*, 2001 WL 120132, at *10 (Bankr. N.D. Ill. Feb. 13, 2001).

8.    In addition to the badges of fraud identified in Section 5(b) of the UFTA, in determining whether a  divorce settlement is fraudulent a court may also consider:

> (1) A quickly agreed upon property division;
> (2) The completion of the divorce proceeding on a 'fast-track;'

34

    (3) The fact that only one of the spouses is represented by
        counsel in the divorce proceeding;
    (4) The fact that the spouses continue to live together after the
    divorce degree in the very house that was transferred;
    (5) The fact that the transferor spouse continues to pay the
    mortgage, taxes, and other costs on the transferred house; and
    (6) The inequitable distribution of debts and assets in the
        divorce

*Shaudt v. United States*, 2013 WL 951138, at *5 (N.D. Ill. March 11, 2013);

*see also*, *In re Boba*, 280 B.R. 430, 435 (Bankr. N.D. Ill. 2002) ("[A]n

agreed transfer of property to a spouse through a fast-track divorce on the

eve of bankruptcy is evidence of a fraudulent scheme to put the property

beyond reach of creditors").

    9.    A fraudulent transfer may be found where the divorce is entirely

a sham *and* also where there is a bona fide divorce, "but the transferor

nonetheless favors transferring assets to the ex-spouse rather than seeing

them go to a creditor body." *In re Hill*, 342 B.R. 183, 196 (Bankr. D.N.J.

2006); *see also*, *In re Fordu*, 201 F.3d 693 (6th Cir. 1999); *In re Williams*,

159 B.R. 648 (Bankr. D.R.I. 1993).  In this latter situation, the divorce itself

may be valid while the division of property is not.

## ULTIMATE RULINGS OF FACT AND LAW

    1.    Federal tax liens against S. Baker for the 1997 to 2002 tax years

arose on the dates of assessment from May 14, 2009, to May 20, 2010, and

attached to all of S. Baker's property and interests in property.  Exs. 47-52.

2.      By February of 2007, when the IRS requested that the Bakers complete a Form 433-A, it is undisputed that the Bakers realized that S. Baker was facing a multi-million dollar tax assessment for his use of a tax shelter on his 2002 federal tax return.  Findings of Fact, *supra*, ¶ 22.  It was at this moment that the Bakers began rearranging assets.  During February of 2007, the Bakers transferred S. Baker's interest in the Hingham and Humarock Properties into two trusts, with at least the couple's two minor children as the beneficiaries.  *Id.* ¶¶ 23-28.

3.      The following badges of fraud apply to these two transfers: (1) the transfers were made to S. Baker's wife and children.  *Id.* ¶¶ 23 & 27.  (2) S. Baker continued to reside at the Hingham Property, remained a named insured on that property and continued to pay bills related to that property.  *Id.* ¶ 55.  (3) The transfer was concealed from the IRS when the couple completed the form 433-A.  *Id.* ¶ 30.  (5) The two properties represented a significant portion of S. Baker's assets.  *Id.* ¶ 32.  (8) S. Baker did not receive any consideration for the transferred assets.  *Id.* ¶ 28.  (9) S. Baker was insolvent at the time he transferred the assets.  *Id.* ¶¶ 15, 20, 32 & 46.  (10) At the time that the assets were transferred S. Baker already knew that he had incurred a significant tax debt.  *Id.* ¶ 22.  These badges of fraud

36

together demonstrate that the transfer of the Hingham property into the S&R Trust was a fraudulent transfer.

4.     On May 29, 2008 the Baker's entered into a final divorce settlement. Pursuant to this settlement R. Baker received, among other things, the Hingham Property, the New Hampshire Properties and the right to future IMA payout funds.  The following badges of fraud apply to this transfer: (1) R. Baker was S. Baker's spouse, the mother of his two children, and the two continued to live together after the divorce.  *Id.* ¶¶ 1-2, 55.  (2) S. Baker continued to reside at the Hingham property, remained a named insured on the property and made the majority of the mortgage payments. *Id.* ¶¶ 46, 55 and 66.  (3) The divorce itself was concealed as the Bakers continued to hold themselves out as married.  *Id.*  ¶¶ 58, 63-66, 71-76, 79-80.  (5) The divorce agreement gave substantially all of S. Baker's assets to R. Baker.  *Id.* ¶¶ 41-54.  (7) After the divorce the couple continued to hide assets – keeping a boat and gym equipment on the property of friends, including that of the Leo family.  *Id.* ¶ 78.   (8) S. Baker did not receive adequate consideration on the transfer.  *Id.* ¶¶ 46-52.  (9) S. Baker was insolvent at the time the transfer occurred.  *Id.* ¶¶ 15, 20, 32 & 46. (10) The transfer was made after a substantial debt was incurred.  *Id.* ¶ 22.

5.    In addition to the above named badges of fraud, there are additional indicia that the divorce was obtained so as to fraudulently transfer assets, including the facts that: only R. Baker was represented by counsel in the divorce (*id.* ¶ 37), the Bakers continued to live together following the divorce in the very house that was transferred pursuant to that divorce (*id.* ¶¶ 55 and 66), S. Baker continued to pay the mortgage and other bills related to the house (*id.* ¶¶ 46 and 55), and R. Baker received a disproportionate amount of the assets while S. Baker received a disproportionate amount of the debts in the divorce (*id.* ¶¶ 41-52).

6.    While the court finds that the divorce settlement agreement fraudulently transferred assets, it takes no position in the validity of the divorce itself.[21]

7.    In general, the court finds neither of the Bakers to be credible witnesses, at least insofar as their financial interests are concerned. Leo credibly testified that R. Baker has problems with honesty. *Id.* ¶¶ 82 & 95. R. Baker admitted in her testimony that she struggles with the truth (*id.* ¶ 83), that she concealed a sexual relationship with the husband of her employer and family friend (*id.* ¶ 93), and that, on at least one occasion, she

---

[21] That said, it is difficult to interpret the enraged assault on Michael Theriault as anything other than the mindless act of a cuckolded husband.

structured a cash withdrawal to conceal the transaction from the IRS (*id.* ¶ 88).   S. Baker, for his part, has engaged in a history of questionable financial finagling for purposes of tax avoidance, including participation in two illegal tax shelters (*id.* ¶ 10), paying expenses like mortgages and meals in cash (*id.* ¶ 70), hiding assets on third-party's property (*id.* ¶ 78) (boat and gym equipment), and using R. Baker as a front for his involvement in various business ventures (*id.* ¶¶ 84 & 87).

## ORDER

The Clerk will enter judgment for the United States on Count II of its Complaint.   As the prevailing party, the United States will, within fourteen (14) days of the date of this Order, submit a Proposed Form of Final Judgment.

SO ORDERED.

/s/ Richard G. Stearns

UNITED STATES DISTRICT JUDGE